658 A.2d 680

Dorothy BATTAGLIA

v.

CLINICAL PERFUSIONISTS, INC.

No. 123, Sept. Term, 1994.

Court of Appeals of Maryland.

May 25, 1995.

Christyne L. Neff (Francis J. Collins, Kahn, Smith & Collins, P.A., on brief), Baltimore, for appellant.

Thomas McCarthy, Jr. (McCarthy & Dernoga, on brief), Annapolis, for appellee.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

Here we construe Maryland's Wage Payment and Collection Law (the Act), Maryland Code (1991, 1994 Cum.Supp.), §§ 3–501 through 3–509 of the Labor and Employment Article (LE). The Act provides, *inter alia*, for a private right of action for certain violations, in which up to three times the

compensatory recovery may be awarded, together with counsel fees. § 3–507.1. As explained below, we shall hold that where the employer breaches an employment contract by terminating the employment after the employee's services had commenced, but where the employer timely pays the wages at the agreed rate for the work performed prior to termination of the employment, the private right of action does not lie.

On October 3, 1991, the appellant, Dorothy Battaglia (Battaglia), and the appellee, Clinical Perfusionists, Inc. (CPI), entered into a written contract whereby Battaglia was to train to become, and perform services as, an on-call autotransfusion technician.[1] It seems to be conceded that the parties contemplated that the services would be performed in Monmouth Medical Center in Longbranch, New Jersey.[2] The contract provided for an annual salary of $17,000 payable in biweekly installments. On November 7, 1991, CPI notified Battaglia that her services were no longer desired. CPI paid Battaglia for services rendered up to November 8, 1991 and paid her two weeks severance pay.

Battaglia filed a two-count complaint in the Circuit Court for Anne Arundel County alleging in Count I breach of her employment contract and in Count II a violation of the Act.[3]

---

1. An autotransfusion technician operates a cell-saving machine which collects a patient's own blood lost during surgery, washes the blood, and returns it to the patient.

2. We assume, *arguendo*, that the Act applies to this employment. Battaglia argued that the Act applies to her employment because the employment contract provided that "[t]his contract is hereby made in the State of Maryland" and "shall be governed by and construed under the laws of the State of Maryland."

3. The relevant portions of the contract between CPI and Battaglia provided:

   "5. **COMPENSATION** Employee shall receive an annual salary of $17,000 to be paid in biweekly installments and subject to all applicable witholding [sic] taxes. This salary may be increased in accordance with company policy without affecting the force and effect of the remaining terms of this contract. In addition to said salary, the Employee shall receive CPI's standard package of bene-

Trial was to a jury. At the close of evidence the trial court granted Battaglia's motion for judgment on Count I as to liability, finding that CPI's termination of Battaglia's employment constituted a breach of contract. The jury awarded Battaglia $16,300 on Count I and $36,000 on Count II. The court thereafter granted, as to Count II, CPI's motion for judgment notwithstanding the verdict.

Battaglia appealed to the Court of Special Appeals, and we issued certiorari on our own motion prior to consideration of the matter by the intermediate appellate court.

The parties agreed that it would be unnecessary to transcribe the record of the trial for this appeal. We infer that the trial court construed the provision in the written contract concerning notice by CPI of termination of employment to be limited to a notice given at least two weeks prior to, but effective only as of, an anniversary of the contract. CPI has not appealed the judgment against it on Count I. Consequently the construction of the notice provisions of the contract is not before us.

The sections of the Act that are most relevant to the parties' arguments are set forth below.

"§ 3–501. **Definitions.**

. . . .

(c) *Wage.*—(1) 'Wage' means all compensation that is due to an employee for employment.

---

fits. CPI hereby reserves the right to alter its standard benefit package during the term of this contract as CPI sees fit.

"6. **TERM** This contract shall be for a term of one year, commencing October 3, 1991, and unless terminated by either party shall automatically be renewed for annual terms thereafter. This contract may be terminated by either party upon the giving of at least two (2) week's written notice. Should Employee fail to give at least two weeks written notice prior to terminating his/her employment with CPI, Employee agrees that he/she shall forfeit his/her last paycheck for the two weeks worked prior to termination without notice. Additionally, CPI may terminate this contract with no notice should Employee fail to successfully complete any portion of his/her training, or receive a negative review from the person conducting his/her training."

(2) 'Wage' includes:

(i) a bonus;

(ii) a commission;

(iii) a fringe benefit; or

(iv) any other remuneration promised for service."

"§ 3–502. **Payment of wage.**

(a) *Pay periods.*—(1) Each employer:

(i) shall set regular pay periods; and

(ii) except as provided in paragraph (2) of this subsection, shall pay each employee at least once in every 2 weeks or twice in each month...."

"§ 3–505. **Payment on termination of employment.**

Each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."

Prior to October 1, 1993 Md.Code (1991), LE § 3–507 was the exclusive civil enforcement mechanism in the Act. It provides for initial informal mediation by the Commissioner of Labor and Industry. *Id.* § 3–507(a)(1). Thereafter, with the consent of the employee, the Attorney General may bring an action on the employee's behalf, *id.* § 3–507(a)(2), in which "the court may award the employee an amount not exceeding 3 times the wage." *Id.* § 3–507(b)(1). The private remedy which Battaglia seeks to enforce was added to the Act as § 3–507.1 by Chapter 578 of the Acts of 1993, effective October 1, 1993.[4] 1993 Md.Laws at 2869. This section reads:

"§ 3–507.1. **Action to recover unpaid wages.**

(a) *In general.*—Notwithstanding any remedy available under § 3–507 of this subtitle, if an employer fails to pay an

---

**4.** CPI has argued that the remedy does not apply retroactively to the facts of this case. In view of our holding, *infra,* construing the Act contrary to Battaglia's contentions, we shall assume, *arguendo,* that the 1993 amendment otherwise would provide an available remedy.

employee in accordance with § 3–502 or § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

(b) *Award and costs.*—If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." [5]

The circuit court granted CPI judgment on Count II at the conclusion of a colloquy with Battaglia's counsel. As we interpret that colloquy the circuit court considered § 3–505 to control Count II. The court reasoned that CPI had not violated the Act because, under the plain language of § 3–505, CPI had paid "all wages due for work that the employee performed before the termination of employment."

Battaglia argues that CPI breached the contract and "nowhere in the contract is the *employer* released from its obligation to pay the wages promised for the term of one year." Appellant's Brief at 6. Relying on that premise, Battaglia asserts that § 3–502 controls, and not § 3–505. Section 3–502 requires an employer to pay to each employee that employee's wages "at least once in every 2 weeks or twice in each month." § 3–502(a)(1)(ii). Battaglia argues that CPI's breach did not extinguish its obligation to pay wages, and that § 3–502 continues CPI's duty to pay Battaglia's wages every two weeks.

Battaglia further asserts that § 3–505 deals only with "valid" terminations, *i.e.*, those not effected by breach of contract, and that § 3–505 does not apply when there has been an "invalid" termination. An "invalid" termination of an employment contract, in Battaglia's reasoning, simply continues the

---

**5.** Chapter 578 also amended § 3–507 to include a provision for counsel fees. 1993 Md.Laws at 2868.

employment and the obligation to pay the agreed wages per § 3–502. Here, Battaglia submits that she continued to be available for autotransfusion duties if called upon so that CPI continued to be obliged to pay her wages. Battaglia concludes that CPI's failure to pay the wages every two weeks violated § 3–502 and subjected CPI to § 3–507.1's remedy of potentially trebling those wages which were withheld.

We were advised at oral argument that the amount of the verdict on Count I reflects any adjustment that the jury might have made in applying the doctrine of avoidable consequences, sometimes called the duty to mitigate. We were further advised that both parties assumed that, if the verdict on Count II had been allowed to stand, it would have been reduced by the amount of the verdict on Count I, in order to avoid a double recovery. Battaglia thereby treats as one and the same thing (1) the amount awarded for breach of the employment contract under Count I and (2) what § 3–507.1 refers to as the wage "withheld" that could be the factor to which a multiplier from zero up to and including three is applied in order to arrive at a verdict under Count II.[6]

■ Battaglia's arguments fail to distinguish between the employer's power to terminate the *employment relationship* by breach of contract and the employer's resulting and continuing liability for that breach of contract. The arguments fail to distinguish between the employer's liability for failure to pay for work already done ("back wages") and the employer's liability for damages for the failure or refusal to pay the wages anticipated to be paid over the balance of the term of the breached employment contract. At common law, where, as here, the contract is entire, *i.e.*, indivisible, and the employment has been terminated, back wages may be recovered either by claiming the value of the work performed (*quantum meruit*), or by including the back wages as part of a claim for

---

6. · CPI has not presented any alternative argument that, even if the jury properly found a violation of the Act, it was nevertheless the duty of the court, and not of the jury, to apply the multiplier. Consequently, that issue is not before us.

breach of the express contract. *Hippodrome Co. of Baltimore v. Lewis,* 130 Md. 154, 157, 100 A. 78, 79 (1917); *Olmstead v. Bach,* 78 Md. 132, 145, 27 A. 501, 503 (1893); *Keedy v. Long,* 71 Md. 385, 390, 18 A. 704, 705 (1889). The Act in § 3–507.1 adds additional incentives to either form of common law action. In the case before us, Battaglia seeks in Count II to characterize her Count I claim for contract damages for breach of the promise to pay wages in the future as a claim for wages, as such, based on her readiness and availability to perform the services of the employment, after its termination and throughout the balance of the period agreed to for employment. Conceptualizing the effect of the breach of an employment contract in this fashion is known as "constructive service." It is a doctrine that "has been altogether repudiated both in England and in this country" for more than a century. *Olmstead v. Bach,* 78 Md. at 150, 27 A. at 505.

*Olmstead* involved a contract under which the plaintiff promised to render services as a cutter in the defendant's merchant tailoring business for one year for which the defendant promised to pay a salary of $50 per week, payable weekly. The contract "was not fifty-two separate, independent contracts, but one indivisible agreement covering the period of a year and making provision for the weekly payment of wages." 78 Md. at 143, 27 A. at 502. The defendant breached the contract by terminating the employment, but paid the plaintiff in full for the week ending April 9, during which the plaintiff was dismissed. Prior to the action in the reported case, the plaintiff sued before a justice of the peace and obtained judgment for $50, the equivalent of the wage for the week ending April 16, which was paid. In the reported case the plaintiff again sued, seeking $250, the wages for the five weeks immediately following April 16. This Court held that the action was barred because of splitting of the cause of action on the indivisible contract. In an effort to avoid the legal conclusion that the prior suit had been one for breach of the contract of employment, the plaintiff argued that it was an action for wages. This Court said:

"But it is insisted the pending suit is not for damages for dismissing the plaintiff, but that it is an action on the contract to recover the plaintiff's salary for the five weeks following the one for which a recovery had been had before the justice of the peace. And the right to recover this salary *as salary* and not as damages for a breach of the contract, is based upon the plaintiff's readiness and willingness to perform his work, and not upon his actual performance of it. In other words, he seeks to recover instalments of salary for work which he never performed, and to recover them merely because he was willing to perform it but was prevented from doing so. As thus presented, under a contract that is indivisible, and which covers a hiring for a whole year at a salary payable in weekly instalments, it is a claim to recover for constructive services.... In both *indebitatus assumpsit* and in an action on an express contract to recover *wages* for services which have not been performed, a recovery is sought for the amount that the plaintiff would have been entitled to recover had the services in fact been rendered; and such recovery is sought, not because the services have been rendered, but because the plaintiff was ready and willing to render them and the defendant prevented him. In both instances, therefore, the readiness of the plaintiff to perform and the refusal of the defendant to allow a performance constitute, when unearned wages are sued for, the ground of the actions, though the forms and the allegations of the pleadings are widely different. That which is sought to be recovered in both cases is the same thing, viz., wages as wages—though in the one case it is under the allegation of work and labor done, which allegation is attempted to be supported by the proof of a readiness and willingness to perform; and in the other it is under an allegation of a refusal to allow that work to be done which the plaintiff had agreed to do, and continues ready and willing to do. Salary as salary, definitively fixed and agreed to, and not a sum of money as unliquidated damages for a broken contract of hiring, is what is sued for under the declaration in the case at bar. It is a suit to

recover wages though no services have been rendered at all, and, if maintainable in that form, would preclude the defendants from showing by evidence that the plaintiff could have secured other similar employment during the time covered by the contract; because if *wages,* distinctively as wages, can be recovered under such conditions instead of damages for a wrongful discharge or dismissal, they must be recovered as specific, ascertained debts, the amount of which is fixed by the contract, and is in no way subject to abatement by circumstances which would reduce the damages in a suit founded on a refusal by the defendant to allow the plaintiff to perform his part of an indivisible contract of hiring. In other words, if under such a contract the plaintiff is entitled to recover wages as wages upon a mere offer to perform, he must be entitled to recover just precisely the wages named in the contract, even though he might have obtained other work of the same kind at the same price during the period for which he claims his wages under the contract. This would be recovering for constructive services. That doctrine has been altogether repudiated both in England and in this country. *Keedy v. Long,* 71 Md. [385] 389 [18 A. 704]."

*Olmstead,* 78 Md. at 148–50, 27 A. at 504–05. *See also Howard v. Daly,* 61 N.Y. 362, 369 (1875); *James v. Allen County,* 44 Ohio St. 226, 236–37, 6 N.E. 246, 252 (1886); *Goodman v. Pocock,* 117 Eng.Rep. 577, 580, 15 Q.B. 576, 583–84 (1850); *Elderton v. Emmons,* 136 Eng.Rep. 1213, 1219–20, 6 C.B. 160, 178 (1848), *aff'd,* 138 Eng.Rep. 1292, 13 C.B. 495 (1853); 5 A. Corbin, *Corbin on Contracts* § 1095, at 515 (1964); 11 S. Williston, *Treatise on the Law of Contracts* § 1361, at 315 (W. Jaeger ed., 3d ed.1968).

Thus, where an indivisible employment contract has been breached, there is a difference between future wages and past wages. Future wages, reduced by whatever credit for avoidable consequences that the employer can demonstrate, and reduced to present value in appropriate cases, is the measure of damages for the failure to pay wages that would have been payable for services that would have been rendered under the contract. On the other hand, past wages, in full,

measure damages for failure to pay wages for services rendered prior to termination.[7]

Against the foregoing background, nothing in §§ 3–502 or 3–505 of the Act alters the common law analysis. Section 3–507.1 supplements, but does not alter, the common law remedies. Nothing in the definition of "wage" in § 3–501(c) alters the common law analysis. There is no indication in the statutory text that the terms "compensation" in § 3–501(c)(1) or "remuneration" in § 3–501(c)(2)(iv) are intended to encompass contract damages in which promised wages for future services, not rendered, may enter into the damages computation.

The construction of the Act that looks to § 3–505 as the applicable violation where wages have not been paid for work done prior to termination of the employment also harmonizes § 3–505 with § 3–502. Under § 3–505 the violation of the Act is not the termination of the employment but the failure to pay "wages due for work that the employee performed before the termination of employment." The failure becomes a violation upon expiration of "the day on which the employee would have been paid the wages if the employment had not been terminated." *Id.* That day is determined by the agreement of hire which, in turn, is regulated by the pay period requirements of § 3–502.

Further, § 3–505 is the more particular provision with respect to terminations of employment, the situation presented in the matter before us. Section 3–505 is not in terms limited to terminations that might be found to be rightful or consistent with any contract of employment. Similarly, if one reads § 3–502 to apply to the termination situation as well (other than by regulating the maximum period between paydays), § 3–502 would not in terms be limited to wrongful, or

---

7. The discharged employee also has the option of treating the contract as rescinded by the breach and suing for the market value of the services rendered but not paid for at the agreed rate. *Keedy v. Long,* 71 Md. 385, 18 A. 704.

contract breaching, terminations and, accordingly, would be duplicative of § 3–505.

Battaglia's alternative submission is that, even if § 3–505 is the relevant section for determining whether there has been a violation when the employment is terminated, there nevertheless has been a violation of § 3–505 in this case because all future wages became "due" when the breach occurred, although no installment of wages would be "payable" until the payday on which the wages otherwise would have been payable if the employment had not been terminated. This argument gives no effect at all to the express limitation in § 3–505 to wages "due for work that the employee performed before the termination of employment."

■ From the plain language of the Act we conclude that there is no violation giving rise to an action under § 3–507.1 where wages have been paid in full for work that was performed prior to termination. Further, even if there were an ambiguity affecting the issue before us, we note that our construction is consistent with the purpose of the private remedy as articulated by the first named sponsor of that amendment to the Act.

Prior to Chapter 578 of the Acts of 1993 the Commissioner of Labor and Industry and the Attorney General enforced the Act. § 3–507. Budget restraints, however, severely curtailed the Commissioner's ability to prosecute these claims:

"Until the budget crises, employees could seek redress by filing a complaint with the Commissioner of Labor and Industry. . . . The Division of Labor and Industry no longer has the funding or the staff to handle wage payment complaints."

*Wage Payment and Collection Law, 1993: Hearings on H.B. 1006 Before the House Economic Matters Committee,* Floor Report (*microfilmed at* H.B. 1006 Legislative Reference File (1993)) (*Hearings*).

With the disappearance of financial authorization for the State to prosecute the wage claims of private individuals, two similar bills were introduced during the 1993 legislative session to provide for a private right of action, House Bill 1006 and Senate Bill 274. House Bill 1006 was enacted.

Written testimony presented to the House Economic Matters Committee on behalf of the lead sponsor of House Bill 1006 reflects that its principal purpose was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.

"With the passage of this bill into law, individuals will be able to take their claims to small claims court and sue their employer for violation of the wage payment and collection laws if they have not been paid *wages for work they have already performed.* Without such a private right of action, the State is in a position in which it requires employers to pay employees for *work performed,* but it cannot enforce that law."

*Hearings,* Testimony presented for Delegate Connie C. Galiazzo (emphasis added).

For all of these reasons, the judgment of the Circuit Court for Anne Arundel County is affirmed.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT, DOROTHY BATTAGLIA.*